Still v. State.

## CARL STILL v. STATE.

### (*Knoxville.* September Term, 1911.)

1. **DYING DECLARATIONS.** Defined; tending to implicate the accused are admissible; rule and its limitations are well established.

It is unquestionably a well established rule that declarations made by one who subsequently dies from an unlawful act, while *in extremis*, and under the full consciousness of his condition and belief of his impending death, commonly called dying declarations, tending to implicate the accused, are competent upon his trial for the commission of the homicide resulting from the unlawful act; but this rule has its limitations which are equally well settled. (*Post, pp.* 85, 86).

2. **SAME.** Same. Foregoing rule is an exception to the general rule excluding hearsay evidence and requiring the State's witnesses to testify in the presence of the accused.

The rule admitting dying declarations as testimony in such cases is an exception to or a qualification of the general rule excluding hearsay testimony, and requiring witnesses to testify under the sanction of an oath or affirmation, and the constitutional right of the accused in a criminal trial to meet witnesses against him face to face. (*Post, p.* 85.)

3. **SAME.** Same. Same. Reason for the exception to or qualification of the general rule.

The reason for this exception or qualification is placed by some upon the ground that the solemn and awful condition of the declarant approaching certain dissolution is equivalent to the sanction of an oath and equally powerful in impelling him to speak the truth, and by others upon the ground of public policy and necessity to prevent the guilty from escaping punishment by their own wrong in destroying the most important witness against them. (*Post, p.* 86)

Still v. State.

4. **SAME.** To prove res gestae of homicide, but not past occurrences and motives.

Dying declarations are incompetent and inadmissible to prove anything further than the *res gestae* of the homicide, that is, the immediate circumstances of the killing and the identity of the perpetrator of the crime, and are inadmissible to prove past occurrences, previous threats, and motives for the commission of the crime. (*Post, pp.* 84-96.)

Cases cited and approved: Nelson v. State, 7 Humph., 543; Poteete v. State, 9 Bax., 270; Leiber v. Commonwealth, 9 Bush. (Ky.), 11; Reynolds v. State, 68 Ala., 502; Sullivan v. State, 102 Ala., 135; Lipscomb v. State, 75 Miss., 559; State v. Shelton, 47 N. C., 360; State v. Perigo, 80 Iowa, 37; State v. Moody, 18 Wash., 165; People v. Fong Ah Sing, 64 Cal., 253; People v. Smith, 172 N. Y., 210.

5. **SAME.** Same. Admission to prove previous threats, past occurrences, and motives, when prejudicial, and properly and seasonably objected to, constitute reversible error when.

The admission of testimony of dying declarations tending to prove previous threats, past occurrances, and motives for the crime, when admitted over the defendant's proper and seasonable objections, and when prejudicial to him, constitute reversible error. (*Post, pp.* 85, 93-96.)

6. **CRIMINAL LAW.** Trial by jury cannot, under the constitution, be denied by supreme court's review of the facts after excluding incompetent and prejudicial evidence.

The constitutional guaranty of a trial by jury means a trial upon competent legal testimony; and if the supreme court should pass finally upon the facts of the case, after excluding the incompetent and prejudicial testimony admitted, and determine that they warranted the verdict and judgment of sentence, it would be a denial of a jury trial under the constitution. (*Post, pp.* 96, 97.)

FROM KNOX.

Appeal in error from the Criminal Court of Knox County.—T. A. R. NELSON, Judge.

WILLIAM BAXTER LEE, JAMES MAYNARD, JR., JEROME TEMPLETON, and S. G. HEISKELL, for Still.

ATTORNEY-GENERAL CATES, R. L. CATES, and R. A. BROWN, for State.

MR. CHIEF JUSTICE SHIELDS delivered the opinion of the Court.

Carl Still, plaintiff in error, was convicted of the crime of murder in the first degree, charged to have been committed upon the body of Gilbert May, and sentenced to death. He has prosecuted an appeal in the nature of a writ of error to this court, and assigned errors.

Gilbert May, while entering the gate of the yard of the residence of an acquaintance, in a suburb of the city of Knoxville, a short while after dark on the evening of May 3rd, 1910, in company with a young lady, Miss Miles, whom he was escorting to a Bible class meeting at that place, was assassinated, the assassin shooting him in the back and escaping in the darkness. He lived until the evening of the next day,

when after making a dying declaration, charging the plaintiff in error, Carl Still, with the assassination, he died.

There is no doubt upon the record that Gilbert May was assassinated as stated, and that his assailant, whoever he may be, is guilty of murder in the first degree. The question presented in this record is the identity of the assassin. The testimony introduced by the State to convict the plaintiff in error of the crime, with the exception of the dying declaration of the deceased, is almost altogether circumstantial. The dying declaration is attacked by testimony tending to prove other statements made by the deceased after he was shot at variance with those proven by the State. There is also testimony offered by the plaintiff in error to disprove the incriminating circumstances against him relied upon by the prosecution.

The chief defense, however, of the plaintiff in error, is an *alibi* to sustain which he testified in his own behalf and introduced three witnesses to corroborate him, that he was at the time of the shooting, which is practically conceded to have occurred thirty-two minutes after seven o'clock on that evening, at the residence of one Samuel Milwee, some distance from the scene of the homicide, and that he remained in the presence of those three witnesses until he was arrested some hours afterwards. The night of the assassination was rather dark; no one was present when the shots were fired, except Gilbert May, Miss Miles and the assassin, and Miss Miles says that she did not see

the assassin. There is evidence in the record tending to show that Gilbert May and Carl Still were both paying court to Miss Miles, and the former expected to marry her, but Miss Miles and the plaintiff in error say that they were only friends.

These facts are here stated to show that the case was hotly contested before the trial court, and that it was one that required the most careful action of the trial judge in the admission and rejection of the testimony and of consideration of the facts by the jury. They are also necessary to show the bearing of certain portions of the dying declaration of the decedent admitted in evidence over the objection of the defendant and assigned as error.

Dr. Walter S. Nash was introduced as a witness for the State and the dying declaration of the deceased charging Carl Still with shooting him and details of the circumstances of the shooting were by him proven. This declaration, it was conceded, was competent and properly admitted so far as it tended to prove the circumstances of the assassination of the deceased, when and where it was done and the identity of the assassin.

The witness was, however, over the objection of the plaintiff in error, seasonably made, allowed to testify, after detailing the declaration of the decedent concerning the circumstances of the shooting, and accusing the plaintiff in error, and further that decedent said that he intended marrying Miss Miles, to a statement then made by the decedent as follows: That

Still v. State.

witness propounded to the decedent the question: "Had Carl Still ever threatened you?" and that declarant answered: "No, but he said: 'If I can't come to see her, you shall not.'"

The objection made at the time to this statement of the declarant, was that it related to a past occurrence and tended to prove a motive for the commission of the crime, as well as a threat to commit it, when, as insisted by plaintiff in error, a dying declaration is not competent to prove anything further than the *res gestae* of the homicide, that is, the circumstances of the killing and the identity of the perpetrator of the crime.

The action of the court in admitting this testimony is assigned as error.

Declarations made by one who subsequently dies from an unlawful act, while *in extremis*, and under the full consciousness of his condition and belief of his impending death, commonly called dying declarations, tending to implicate the accused, are competent upon his trial for the commission of the homicide resulting from the unlawful act. The rule admitting this character of testimony in such cases is an exception to or a qualification of the general rule excluding hearsay testimony, and requiring witnesses to testify under the sanction of an oath or affirmation, and the constitutional right of the defendant in a criminal trial to meet the witnesses against him face to face.

Courts, in the adjudged cases, and the text-books upon the subject, differ some in the reasons justifying this exception or qualification, some placing it upon the ground that the solemn and awful condition of the declarant approaching certain dissolution, is equivalent to the sanction of an oath and equally powerful in impelling him to speak the truth. While others put it upon the ground of public policy and necessity, because otherwise, in many cases where no one was present, or there was serious conflict in the testimony of those who were present, the guilty might escape punishment largely by destroying the most important witness to the commission of the crime.

The rule, however, is well established and cannot now be questioned. But it has its limitations which are equally well settled.

Among other limitations, it is well settled that the declaration admissible is confined to the immediate circumstances of the homicide and the identity of the party committing it. Previous threats made by the accused against the declarant and facts tending to prove a motive for the crime, occurring before the homicide, cannot be proven in this way. This was early settled in this State. In the case of *Nelson* v. *The State*, decided in 1847, and found reported in 7 Humph., 543, Judge Reese, speaking for the court, in reversing a conviction of the plaintiff in error for murder for the admission of an incompetent dying declaration, after holding that the declaration was inadmissible because not made *in extremis*, said:

"It may well be doubted, if this had been otherwise, whether the subject-matter of the declaration, namely, that the prisoner 'had two or three times before tried to kill him', would have been competent testimony. Declarations are admitted, from the necessity of the case, to identify the prisoner and establish the circumstances of the *res gestae* or direct transactions from which the death results. When they relate to former and distinct transactions, they do not seem to come within this principle of necessity."

This enunciation of the rule is in accord with the great weight of authority, judicial and text-book, and has been continually recognized and followed as the law in this State.

In Phillips on Evidence, Vol. 1, 232, it is said:

"Dying declarations have been limited even in criminal cases and the rule is now that such declarations are generally admissible only where the death of the declarant is the subject of the inquiry, and where the circumstances of his death are the subject of his dying declaration."

This is quoted with approval by Freeman, Judge, in the case of *Poteete* v. *The State*, 9 Bax., 270.

Mr. Bishop, in his work on Criminal Procedure, Vol. 1, section 1207, states the rule to be:

"The limits are, that the declaration must proceed from the very person alleged to have been killed, one from any third person not being admissible; it must relate to the circumstances of the killing and by whom; it cannot also include what went before, or a separate

and disconnected fact, or an opinion, or the state of feeling existing between the declarant and the defendant. To no greater extent, and in no other causes, civil or criminal, is it receivable."

In Underhill on Criminal Evidence, section 109, it is said:

"Must refer to the *res gestae* of the homicide. The declaration is admissible only so far as it points directly to the facts constituting the *res gestae* of the homicide; that is to say, to the act of the killing and to the circumstances immediately attendant thereon. A dying declaration showing why the deceased went to the place where the homicide was committed, or that, after the crime, he stated to a bystander that he was unarmed, or stating actions of the accused or of the deceased prior to the circumstances, directly involved in the homicide as the possible motive for it, is not admissible. Thus, a statement that enmity always existed between the prisoner and the declarant, or that they had always been friends, or, describing previous altercations between them, or detailing threats made by the accused, against the deceased long prior to the crime, has been rejected."

And in the great work of Mr. Elliott on Evidence, Vol. 1, sec. 336, we find this in regard to the limitations of the rule:

"The declarations must relate to the cause of the death, or to some circumstance of the transaction which resulted in the death. Declarations of distinct or separate prior or subsequent occurrences, as, for in-

Still v. State.

stance, of antecedent threats, are not competent evidence. These and other such declarations are not competent because they relate to distinct and separate transactions. So dying declarations are, as a rule, not admitted to prove what occurred before the act which caused the declarant's death. And so dying declarations to prove what occurred after that transaction are, as a rule, excluded. It has been held that declarations made by the declarant after he was shot, calling the attention of witnesses to the fact that he was unarmed, should not be admitted. And it has been held that dying declarations showing the feelings between the declarant himself and the accused are not competent evidence for the prosecution. So, when it is necessary for the expression and language to be aided by conjecture or supposition to establish the facts necessary to be proved to criminate the accused, such indefinite statements are not competent, for they must clearly refer to the cause of death or to some circumstance of the transaction which resulted in the death."

The limitation of such evidence to the *res gestae* or immediate facts of the homicide and the identity of the accused, are stated in equally as strong language by the courts of last resort of other States. We make some quotations from the opinions of those courts.

"The admission of dying declarations as evidence, being in derogation of the general rule which subjects the testimony of witnesses as ordinarily received to

the two important tests of truth, an oath and a cross-examination, it is obvious that such evidence should be admitted only upon the grounds of necessity and public policy, and should be restricted to the act of killing and the circumstances immediately attending it, and forming a part of the *res gestae.*" *Leiber* v. *Commonwealth*, 9 Bush. (Ky.), 11.

"Dying declarations are admitted to identify the prisoner and the deceased, to establish the circumstances of the *res gestae*, and to show the transaction from which the death results. . . . The dying declaration of a deceased person, showing the state of feelings between himself and defendant charged with his homicide, are not competent evidence for the prosecution." *Reynolds* v. *The State*, 68 Ala., 502.

"That dying declarations are restricted to the act of killing, and the circumstances immediately attending it and forming a part of the *res gestae.*" *Lipscomb* v. *State*, 75 Miss., 559.

"Nothing previously done or said unless called up and made a part of the altercation can be proven as a dying declaration." *Sullivan* v. *State*, 102 Ala., 135.

In the case of the *State* v. *Shelton*, 47 N. C., 360, the court said, on page 364, as follows:

"As in many cases the knowledge of the facts attending the killing is confined to the party killed and the perpetrator of the crime, there is public necessity for admitting dying declarations as evidence, 'in order to preserve life by bringing manslayers to justice', but as the exception can only be sustained on the

Still v. State.

ground of necessity, it is restricted to cases of indictment for homicide and it is further restricted to the act of killing and the circumstances immediately attending the act and forming a part of the *res gestae*. If it can be extended to a separate and distinct act occurring half an hour before, it will extend to any act done the day before, or a week, month, or even a year. As soon as the limit fixed by absolute necessity is passed the principle upon which the exception is based being exceeded, there is no longer any limit whatever, and dying declarations become admissible, not merely to prove the act of killing but to make every homicide murder by proof of some old grudge.

"That the exception is restricted in the manner above stated is clear for the reason of the thing and is settled by authority."

For error in the admission of a previous threat this case was reversed.

In the case of the *State* v. *Perigo*, 80 Iowa, 37, it was held that declarations made by the deceased in regard to threats made against him by the defendant before the homicide were improperly admitted.

The Court said:

"These threats were not the statement of anything forming a part of the *res gestae*, but of a foreign and distinct transaction. The rule that dying declarations should point distinctly to the cause of the death, and to the circumstances preceding and attending it, is one that should not be relaxed."

"We are clearly of the opinion that this testimony was improperly admitted. While it is true there was no question but that the defendant inflicted the mortal wound, and the statements testified to contain nothing as to the facts or circumstances of the homicide, and were, therefore, immaterial, yet we cannot say that the defendant was not prejudiced thereby. While the jury may have regarded the statement of deceased as to the hardship of his situation, as immaterial, we cannot say the same as to the statements that threats had been made against him."

In the case of the *State* v. *Moody*, 18 Wash., 165, it was held that the statement in the dying declaration, that the accused had made previous threats against deceased, were inadmissible evidence because they were no part of the *res gestae*. In this case, the part objected to was as follows: "Had he ever threatened before to injure you?" And the answer: "Yes." The court said:

"We think it may be conceded without citation of authority, that prior threats are no part of the dying declaration, that they are no part of the *res gestae*, and therefore, cannot be admitted as a dying declaration of the deceased. The universal rule is that dying declarations are restricted to the act of the killing and the circumstances preceding it and forming a part of the *res gestae*."

In the case of the *People* v. *Fong Ah Sing*, 64 Cal., 253, the dying declaration admitted contained the statement of a former difficulty, which occurred a few

days previous to the shooting, between the declarant and defendant.

The court in reversing the case said:

"Dying declarations are restricted to the act of the killing and to the circumstances immediately attending it and forming a part of the *res gestae*. When they relate to former and distinct transactions, they do not come within the principle of necessity on which such declarations are received."

In the case of *People* v. *Smith*, 172 N. Y., 210, the defendant was convicted of murder in the first degree. The court reversing the case for the admission of an incompetent dying declaration, said:

"The more serious question, however, is whether the declarations of the decedent were properly admitted as to what transpired before the time of the homicide. The record plainly discloses that the proof of the dying declarations of the decedent in which it was stated that she said, 'I guess I got up first; I heard him strike a match; it was about twelve o'clock, and I got into bed first', all related not to the transaction which took place at the time of the tragedy or to the homicide, but to a disconnected transaction which occurred about three hours before the fatal injuries were received by her. As to her statements in this respect, there is some variance in the proof. But without considering any discrepancies in the evidence, it is obvious that the greater portion of the dying declaration of which proof was admitted referred, not to the homicide, but to an occurrence which took

place hours before. Manifestly, that occurrence formed no part of the *res gestae*, but was an independent transaction, not shown to have had any connection with the crime, and the declarations of the decedent in relation thereto were a mere narrative of past occurrences and not a part of the act which resulted in death. It seems to be well settled that dying declarations are admissible in cases of homicide, only when the death of the decedent is the subject of the charge, and the circumstances of the death are the subject of the declaration, and that they may not properly include narratives of past occurrences.

"It is, therefore, manifest that under the rules of law governing the admission of dying declarations, the trial court erred in admitting proof of the declarations of the decedent as to what occurred previous to the homicide."

There are many other cases in accord with these, and we have found none in conflict except those decided by the supreme court of Georgia.

The rule admitting dying declarations with, among others the limitation stated, in homicide cases is very ancient and its application for many years has proven it to be a very wholesome one, but we do not think it should be extended. To do so would open the door to possible abuses of a serious nature. As stated by this court in *Poteete* v. *The State*, supra, "Such testimony is subject to many objections and inherent infirmities. The party is not in condition, frequently, to give calm attention to the question to which he

makes his statement.  It is usually made in the presence of friends whose feelings are excited against the other party against whom they are to be used, and who may easily direct the dying man's attention to the points in the case bearing most heavily on the guilt of the accused, and who will most naturally leave out of the view all that tend to a different view.  The accused is not present, and has neither an opportunity to make suggestions to call attention to the circumstances in his favor, nor to cross-examine to show inaccuracies of memory, or express bias from passion or prejudice."

The context shows that the objectionable statement related to a past occurrence between decedent and plaintiff in error in regard to the young lady the former was escorting that night.  There is no pretense that it was part of the *res gestae*.  It is equally certain that it was very prejudicial to the plaintiff in error.  It furnished the only evidence of a motive for the crime in the record,—jealousy—a motive which as the attorney-general stated in his argument at the bar is one of the most frequent found in cases of this character, and the experience of men and the annals of criminal jurisprudence show that the passion aroused by it is of the most cruel and relentless character.  There is no evidence of any motive upon the part of any other person appearing in the record to take the life of Gilbert May, and this testimony therefore, challenged the attention of the jury very powerfully.

The objectionable statement also involves a threat to do the declarant violence, a threat directly applicable to the facts of this homicide. It was to the effect that plaintiff in error would interfere to prevent the defendant from paying attention to Miss Miles, and he was shot and killed while doing this very thing.

There was no other testimony in the record tending to prove a threat of this nature.

It is probable that this incompetent testimony had great weight with the jury in reconciling the many discrepancies and conflicts existing and inconsistencies claimed to exist in the testimony of the witnesses for both the prosecution and the defense, and in leading them to the conclusion that the plaintiff in error was guilty. It is reasonable to say that it did have some weight with the jury in arriving at the verdict. It was incompetent, and the admission of it over the objection of the plaintiff in error was reversible error.

We cannot inquire whether excluding this incompetent testimony, the evidence sustains the verdict of guilty. That is a question for a jury to decide. The constitution guarantees every citizen a trial by a jury of his peers. This means a trial upon competent legal testimony. Such a trial the plaintiff in error has not had. If this court should now pass finally upon the facts of the case excluding the incompetent testimony admitted, it would be a denial of a jury trial. It is only where the court can see that the in-

Still v. State.

competent evidence admitted did not prejudice the defendant in the trial court, that this court will consider and determine the case upon the facts. As stated, we hold that this testimony was prejudicial. Therefore, this assignment of error must be sustained and the judgment reversed and the case remanded to the lower court for a new trial.

There is also an assignment of error that the evidence preponderates against the verdict of guilty and in favor of the innocence of the plaintiff in error. We do not pass upon this assignment. The case must again go before a jury, and we do not decide or intimate anything upon this question. It would be improper for us to do so.

We determine nothing as to the guilt or innocence of the plaintiff in error.

Reversed and remanded for a new trial.