THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* MAX LUDKOWITZ, Appellant.

234

(Argued January 15, 1935; decided February 26, 1935.)

*David F. Price* and *Alexander Baldwin* for appellant. The admission of the alleged dying declaration constituted error. (*People* v. *Falletto*, 202 N. Y. 494; *People* v. *Mikulec*, 207 App. Div. 505; 240 N. Y. 573; *People* v. *Sullivan*, 239 App. Div. 511; *People* v. *Sarzano*, 212 N. Y. 231; *Shepard* v. *United States*, 290 U. S. 96; *People* v. *Ricken*,

242 App. Div. 106; *People* v. *Brecht*, 120 App. Div. 769; 192 N. Y. 581; *People* v. *Kane*, 213 N. Y. 260; *Young* v. *State*, 95 Ala. 4; *People* v. *Chase*, 79 Hun, 296.) The guilt of the defendant was not established beyond a reasonable doubt. The dying declaration unsupported by other evidence is insufficient to sustain the judgment of conviction. (*People* v. *Kraft*, 148 N. Y. 631; *People* v. *Corey*, 157 N. Y. 332; *People* v. *Haber*, 221 App. Div. 150; *Reeves* v. *State*, 106 Miss. 885; *Marley* v. *State*, 109 Miss. 717; *People* v. *Cassidy*, 160 App. Div. 651; *People* v. *Ledwon*, 153 N. Y. 10; *People* v. *Pignataro*, 263 N. Y. 229.) The trial court erred in charging the jury. (*Darry* v. *People*, 10 N. Y. 120; *People* v. *Gallo*, 149 N. Y. 106; *People* v. *Darragh*, 141 App. Div. 408.)

*William F. X. Geoghan, District Attorney (Henry J. Walsh* of counsel), for respondent. All the legal requisites of a dying declaration were established and the declaration was properly received in evidence and upon it the jury was justified in finding the defendant guilty of the crime of murder in the first degree. (*People* v. *Sullivan*, 239 App. Div. 511; *People* v. *Kraft*, 91 Hun, 474; *People* v. *Falletto*, 202 N. Y. 494; *People* v. *Corey*, 157 N. Y. 332; *Hackett* v. *People*, 54 Barb. 370; *Waldele* v. *N. Y. C. & H. R. R. R. Co.*, 95 N. Y. 274; *People* v. *Sarzano*, 212 N. Y. 231; *Shepard* v. *United States*, 290 U. S. 96; *People* v. *Kane*, 213 N. Y. 260; *People* v. *Del Vermo*, 192 N. Y. 470; *People* v. *Conklin*, 175 N. Y. 333.) The trial court committed no errors in its charge. (*People* v. *Jernatowski*, 238 N. Y. 188.)

HUBBS, J. The appellant has been convicted of the crime of murder in the first degree under an indictment charging that on July 5, 1934, he " wilfully, feloniously and of malice aforethought, shot Benjamin Simon with a revolver, inflicting upon the said Benjamin Simon injuries as a result of which he died on July 6, 1934."

The homicide occurred in front of a restaurant at 49 Humboldt street in the borough of Brooklyn. At about

nine-thirty o'clock in the evening the deceased drove up to the restaurant in his automobile, got out and took a chair facing the restaurant with his back to the curb. Two other men were sitting in front of the restaurant facing the curb, one on the same side of the entrance as deceased with whom deceased was engaged in conversation, and the other on the opposite side of the entrance. Shortly thereafter the man who was talking with deceased heard shots, saw the deceased jump up and run into the restaurant and he ran across the street. He testified that he did not see the shooting or the man who did it. The other man sitting in front of the restaurant and two men who were on the opposite side of the street testified that they saw the shooting. One said there were two assailants, the others one, but all agreed that appellant was not present and did not do it. No one testified to any act on the part of deceased indicating that he turned around or saw his assailant.

The appellant himself testified that he knew deceased; that he was not in the vicinity of the restaurant that night and that he did not do any shooting. He admitted that several months prior to the trial he and deceased had entered into a mild dispute as a result of the fact that he had remonstrated with deceased because, as he explained, the deceased had been practicing extortion upon the owners of unlawful drinking places; that they were in each other's company thereafter; and that their friendly relations continued notwithstanding the argument. It appeared that, upon learning of the homicide and that he was being sought in connection therewith, he surrendered himself to the authorities.

There was no testimony on the part of any eye-witness directly or indirectly connecting appellant with the crime or which indicated that he was in the vicinity of the restaurant on the evening in question. The only evidence offered which might tend to show that appellant was the man who did the shooting was an alleged dying declaration

offered on the part of the People, and the testimony of the detective who took down the declaration and of a surgeon who was present when it was taken. The declaration reads as follows:

" ANTE MORTEM STATEMENT.

" Place — St. Catherine's Hosp.— Time 10:10 P. M. Date — July 5th, 1934.

" Q. What is your name?   A. Benjamin Simon.

" Q. Where do you live?   A. 158 Boerum St.

" Q. Do you believe you are about to die?   A. Yes.

" Q. Have you any hope of recovery from the effects of the injury you have received?   A. No.

" Q. Are you willing to make a true statement as to how and in what manner you came by the injury from which you are now suffering?   A.   I was sitting by the store and fire works fired by Max Ludkowitz (Larney's brother).   10:20 P. M.

" Q. How long do you know Max Ludkowitz?   A. A long time.   I then showed injured man a picture of Max Ludkowitz and asked him is this the man that shot you? Yes that's Max Ludkowitz the fellow that shot me.

" Signature — Unable to sign.

" Name of Doctor — Leslie Hughes Tisdall, M. D.

" Name of nurse —

" Statement taken by — Det. Vitalo

" Statement witnessed by — Det. Sarcono
                          Det. McCarron

" Detective assigned to case — Det. Vitalo #1080 —85."

The detective testified that he went to the beer garden, arriving there about 9:55 P. M.; that he saw deceased lying on the floor inside the door; that deceased was conscious; that within five minutes an ambulance arrived; that he went to the hospital with deceased where he saw the surgeon; that the antemortem statement, which it appears was on a police blank, was in his handwriting except for the signatures; that he wrote down verbatim

what deceased told him in response to the questions he put to him; that after asking the first six questions, he went to the police station and returned with two photographs of appellant which he showed to the deceased; that the deceased identified one of them as the man who shot him.

The physician testified that several detectives, including the one who testified, questioned deceased for half an hour before the statement was taken; that at first deceased told the detective who testified to mind his own business — that he would take care of himself; that he, the surgeon, told deceased that he was in a dying condition and advised him if he had anything to say he better tell it to the detective who was questioning him at the time — that he was most likely going to die; that the detective first asked deceased whether or not he realized that he was in a dying condition and the deceased said he did; that the detective asked what happened and that deceased said he was sitting in the beer garden just after arrival. The witness testified that was all he could recall at the time, but that he heard the questions asked and the answers given, also that he heard the questions read back to the deceased, and that the witness read the questions and answers before he signed as a witness; that at the time deceased was suffering from twelve bullet wounds of the chest, face, abdomen and arms, and from considerable loss of blood.

It is seriously contended by the counsel for appellant that the trial court erred in receiving in evidence the dying declaration. The general rule as to the preliminary proof necessary to entitle dying declarations to be received in evidence is reasonably well established. The application of the rule to particular cases has resulted in some conflict in decisions, as each case differs in its surrounding circumstances from all others.

The rule governing the admission of dying declarations is anomolous, and constitutes an exception to the general

rule of evidence which prohibits the receipt in evidence of hearsay statements. Courts, in applying the rule permitting the receipt in evidence of dying declarations, have strictly enforced the rule which requires that before their receipt in evidence a preliminary examination must clearly establish to the satisfaction of the trial judge that the deceased was, at the time, under the sense of impending death and without any hope of recovery. Different courts have expressed the thought in different language, but the meaning intended to be expressed is the same. (3 Wigmore on Evidence [2d ed.], p. 169; *People* v. *Sarzano*, 212 N. Y. 231; *People* v. *Falletto*, 202 N. Y. 494; *Shepard* v. *United States*, 290 U. S. 96.)

Whether the preliminary proof advanced is sufficient to admit the receipt in evidence of a dying declaration presents in each case a question which must be determined by the trial judge. (*People* v. *Smith*, 104 N. Y. 491; *People* v. *Kraft*, 148 N. Y. 631; *People* v. *Del Vermo*, 192 N. Y. 470.) Its determination rests not alone upon the declarations of the deceased, but includes the surrounding circumstances. The general rule was stated by VANN, J., in *People* v. *Falletto* (*supra*) as follows: " The absolute requirements preliminary to the admission of such evidence are that there must be clear proof of the certainty of speedy death, and that the declarant had no hope of recovery. Such facts, however, as we have recently held, need not be proved by statements made to or by him, but may be inferred from the surrounding circumstances, such as the nature of his wounds, his physical condition, preparation for death and the like " (p. 500). The preliminary testimony in this case brought it within the rule prevailing in this jurisdiction and the declaration was properly received in evidence.

The conviction must stand, if at all, upon the dying declaration and the testimony regarding its execution, uncorroborated by any evidence tending to connect the appellant with the crime charged. It is urged by appel-

lant that an uncorroborated dying declaration in no case establishes guilt beyond a reasonable doubt, and that a court is never justified in permitting a conviction upon an uncorroborated dying declaration, and that such declarations are admitted in evidence solely in support of other direct or circumstantial evidence which connects the defendant with the commission of the crime and not as primary evidence which, standing alone, will be sufficient to support a judgment of conviction.

We are unprepared to hold, as it is unnecessary to the decision which we are about to make, that there may never be a case upon which a determination of guilt may properly rest upon an uncorroborated dying declaration.

We entertain no doubt, however, that the conviction in this case should not be permitted to stand upon the uncorroborated dying declaration received in evidence. As stated in Wood's Practice Evidence, page 326: " It is the universal judgment of the courts, text-writers, and all thinking men, that this class of evidence is to be received with great caution, and, except where the circumstances were such as to render it next to impossible that the deceased could be mistaken as to the criminating facts stated, juries should scan the statement with great care, especially where there is evidence tending to show that the deceased was mistaken, for it is to be remembered that while the deceased made the statement under the apprehension of certain death, yet the respondent has not had the privilege of cross-examining the witness, or testing the real foundation of the deceased's belief as to his guilt, and that where the witness has not a deep sense of accountability to his Maker, and an enlightened conscience, the passion of anger, and feelings of revenge, or, in the case of mutual conflict, the natural desire of screening his own misconduct, may affect the truth and accuracy of his statements, and give a color to the transaction which, had further investigation been attainable, might

have been proved to be incorrect." We believe the statement of the learned author correctly summarizes the decisions in the best considered cases.

Three witnesses present at the time of the shooting each testified that they saw the man who shot deceased, and that appellant was not the man. Two described the man who did the shooting and each was in a position where he could plainly see what transpired. No circumstance was testified to which affected the credibility of either of those witnesses except minor discrepancies which were of slight importance. No motive was shown for the act and no evidence corroborating the dying declaration was offered.

Under such circumstances to permit a conviction to stand would shock one's sense of justice.

The fact that the testimony introduced by the People constituted some evidence which presented a question of fact proper to be submitted to the jury does not necessarily lead to the conclusion that such evidence was sufficient to establish the guilt of the defendant beyond a reasonable doubt. While the preliminary proof was sufficient to permit the introduction in evidence of the dying declaration, still it was not as clear and satisfactory as in most cases where such declarations have been received. Under the conditions existing at the close of the case it was clearly the duty of the court carefully to instruct the jury as to the weight to be given to such declaration in arriving at its verdict. It has been repeatedly stated by courts of the highest standing that the receipt of such evidence is in violation of the rule which excludes the receipt of hearsay evidence; that its receipt is based upon public necessity in order to protect the innocent and prevent murder going unpunished; that other satisfactory proof is unobtainable; and that the belief of impending death is equivalent to an oath. (3 Wigmore on Evidence [2d ed.], §§ 1440, 1441 and 1442.)

In the case of *People* v. *Falletto* (*supra*) Judge VANN pointed out in detail the danger which exists in convicting upon an uncorroborated dying declaration, where fear of prosecution for perjury does not exist and the test afforded by cross-examination is lacking. He then wrote: " Still the law does not regard such evidence, when admitted, as of the same value and weight as the testimony of a witness given in open court under the sanction of an oath and under the tests and safeguards which are there provided " (p. 500). In *People* v. *Kraft* (*supra*, p. 635) the trial court in a murder case charged the jury upon the question as to the weight which it should give to a dying declaration that it was the jury's duty to take it into consideration as competent testimony as it had all the sanction of evidence that the law could ascribe to evidence. This court held that the charge was erroneous. In the opinion it was said: " It was, therefore, of the utmost importance that the jury should not receive the incorrect impression that, however admissible in evidence the dying statement, it was as valuable, or as authoritative, for the purpose of proving the defendant's guilt, as though the inculpatory evidence had been given by a witness in a court of justice and with every opportunity to the defendant to investigate its truth by means of cross-examination." (*People* v. *Corey*, 157 N. Y. 332; *Armstrong* v. *United States*, 41 Fed. Rep. [2d] 162.) In the case at bar the trial judge in the main charge stated: "And they [dying declarations] have been permitted to be used for a long period of time because of the belief that the person who makes the statement is approaching dissolution, and has given up all hope of recovery, that these conditions combined make the statement the equivalent of having the sanctity of an oath. * * * The court having admitted it then it is for the jury to determine what weight it will give to the statement, and what finding it will make as a result of the statement." As a statement of law the charge was correct, but the court failed to say one word about how the jury should

weigh the dying .declaration. It might well have understood from the charge that the statement was entitled to the same weight as that of a witness who had given his testimony in open court subject to cross-examination. Counsel for appellant, at the close of the charge, by various requests to charge, called attention to that fact, but the trial judge did not, at any time, give further instruction upon that question.

The court should, in answer to requests, have told the jury that the statement was not to be considered as having the same probative value as the testimony of a witness given in open court, subject to cross-examination, and should have explained the reason for receiving dying declarations in evidence. The jury would then have been in a position properly to weigh the evidence in arriving at a verdict. (*Armstrong* v. *United States, supra; State* v. *Valencia*, 19 N. M. 113 [52 L. R. A. (N. S.) 152, and note]; `Worthington` v. *State*, 92 Md. 222 [56 L. R. A. 353, and note].)

When we are satisfied that a judgment of conviction in a death case is contrary to the weight of evidence and that the ends of justice require a new trial, it is our duty to grant it. (*People* v. *Cashin*, 259 N. Y. 434.)

We are satisfied also that the case was erroneously submitted to the jury under section 1044, subdivision 2, of the Penal Law. That subdivision is not applicable to the facts in this case. It clearly appears that the person who fired the fatal shots deliberately aimed at the deceased, that his intent was to hit a particular person, *i. e.*, the deceased. (*Darry* v. *People*, 10 N. Y. 120.)

The judgment of conviction should be reversed and a new trial ordered.

CRANE, Ch. J., LEHMAN, O'BRIEN, CROUCH, LOUGHRAN and FINCH, JJ., concur.

Judgment of conviction reversed, etc.